580 So.2d 1195 (1991)
Steven Edward RIDDLE
v.
STATE of Mississippi.
No. 07-KA-59363.
Supreme Court of Mississippi.
May 3, 1991.
*1196 Charles P. Leger, Jackson, Pete Halat, Jr., Halat & Sherry, Biloxi, for appellant.
Mike C. Moore, Atty. Gen., Deirdre McCrory, Sp. Asst. Atty. Gen., Jackson, for appellee.
Before ROY NOBLE LEE, C.J., and PRATHER and ROBERTSON, JJ.
ROBERTSON, Justice, for the Court:

I.
This is another of those cases the instinct suggests ought to have been rather straightforward but which  on one issue, at least  has proved worrisome. Our concern is lack of full findings of fact on a preliminary but dispositive point. The defendant confessed the burglary charge against him, and the question is whether en route he enjoyed legally adequate access to counsel. We hold that he did and affirm his conviction and sentence.

II.

A.
Marie Horne lived at 12 Shirley Court in Biloxi, Mississippi. As was her custom, Horne left home in November of 1986 and traveled to Baton Rouge, Louisiana, for an extended holiday visit with her mother. On or about December 6, 1986, someone broke and entered Horne's home and took most of her household belongings: furniture, a microwave oven, silverware, paintings, *1197 draperies and, as will presently appear significant, china figurines. A neighbor called Horne in Baton Rouge and told Horne her house had been burglarized, but for the moment, no leads or suspects were apparent.
About the same time, Ellen Simmons, then Ellen Brown ("Brown"), was living at a battered women's shelter "on the bay"[1] and was working at Keesler Air Force Base (AFB). The day after Christmas, 1986, Brown met twenty-eight-year-old Steven Edward Riddle at the Tic Toc Lounge and had a drink with him. Riddle was the Defendant below and is the Appellant here. Brown was "looking for a place to live" so she "could get out of the women's shelter." A prospective landlord had offered Brown a house, rent-free for two months, provided Brown would "find somebody to fix the plumbing and all the other things that needed to be done... ." Brown told this to Riddle, who said he would do these things, if she would allow him to share the house. Brown agreed, but the joint occupancy plan soon evolved into more than she had bargained for.
Well, he [Riddle] started moving in and he started .. . by ... bringing stuff in the house and working outside on the plumbing and bringing in a little bit more stuff in the afternoon over to the house until it got packed ... I couldn't move. It was getting loaded.
Brown described the "stuff" as "tables, cabinets, beds, ... [c]hairs, TV, microwave, silverware, pictures, curtains, a whole house works ... whatnots and everything was piled up." Finally, Riddle told Brown that "all the stuff had to come out of the house because it was getting too loaded." He suggested putting "the stuff in storage." The only obstacle was that the storage firm required identification and "nobody had a driver's license" except Brown. Unaware that the goods had been stolen, Brown agreed to rent a storage unit in her name. After she did so, Riddle "and another guy" hauled the loot out of Brown's house and took it to the storage locker.
The next morning, January 11, 1987, Brown asked Riddle "where it [had] all come from." He confessed that he "had stolen it out of a house." After taking her children to school, Brown went to the Biloxi Police Department and spoke with John Williams, Chief of Detectives, and told Detective Williams what had happened. Shortly thereafter, Riddle was placed under arrest.

B.
On June 3, 1987, the Harrison County grand jury returned an indictment charging Steven Edward Riddle with the burglary of Horne's dwelling. Prior to trial, Riddle moved to suppress inculpatory statements he had made to Detective Williams shortly after his arrest in January of 1987. The Circuit Court denied the motion. The case was called for trial, and Riddle's confession was admitted as evidence against him. In the end, the jury found Riddle guilty as charged. On December 8, 1987, the Circuit Court sentenced Riddle to serve ten years in the custody of the Mississippi Department of Corrections. See Miss. Code Ann. § 97-17-19 (1972). Riddle filed the usual post-trial motions, and the Circuit Court denied these.
Riddle now appeals to this Court, challenging his conviction and sentence.

III.
Riddle makes no challenge to the legal sufficiency of the evidence against him, nor could he with credibility. The evidence establishes without contradiction that on December 6 Horne's house was forcibly entered through the kitchen window. The prosecution produced a witness who purchased china figurines from Riddle. Horne said these were hers. The prosecution further proved that Triangle Pawn Shop had received a microwave oven from Riddle, one subsequently shown to have been taken from Horne's house. Horne later identified numerous items Riddle had placed in storage as belonging to her. All of this, coupled with Ellen Brown's substantially incriminating testimony, and *1198 even without Riddle's confession, put the present conviction beyond our authority to disturb. See, e.g., Brown v. State, 556 So.2d 338, 340-41 (Miss. 1990); Mack v. State, 481 So.2d 793, 795-96 (Miss. 1985); Riddles v. State, 471 So.2d 1234, 1237 (Miss. 1985).

IV.

A.
Over Riddle's objection, the Circuit Court allowed Detective Williams to testify that, two days after his arrest, Riddle had confessed that he had burglarized Horne's home and had hidden his take at different friends' houses, put other items in a mini storage unit, and kept the rest to furnish the house in which he was living. Riddle claims this statement was extracted from him in violation of his right to counsel secured by the Sixth and Fourteenth Amendments to the Constitution of the United States and by Article III, Section 26, of the Mississippi Constitution of 1890.

B.
The factual setting is important. In early January, 1987, Detective Williams suspected Riddle in the seemingly unrelated arson of an automobile. On January 6, Williams interviewed Riddle in that regard at the Biloxi Police Station. Prior to any questioning, Williams gave Riddle the familiar Miranda[2] warnings, reading from a card Williams carried for that purpose. Williams also questioned Riddle about the Horne burglary. It appears Williams had become aware Riddle had pawned a microwave oven believed to belong to Horne. Riddle denied any criminal involvement and was soon released.
Then the arson victim produced china figurines Riddle had given him, and Williams determined that these had come from Horne's home. When Ellen Brown contacted police and told of Riddle's pilferage, Detective Williams had Riddle arrested on January 12, 1987. The interrogation at issue took place on January 14.
At the police station, Detective Williams asked Riddle if he knew anything about the burglary of Horne's home. Riddle said, "No." All agree that Riddle then said he wanted to talk with his lawyer. At the time, Frederick J. Lusk, Jr., a lawyer with his office in Biloxi, was representing Riddle on an unrelated matter. When Riddle asked to talk to Lusk, Detective Williams stopped all questioning and placed Riddle in a holding cell. Some six hours or so later, Detective Williams called Riddle back to his office. Williams advised Riddle that the Biloxi police had developed witnesses to show that various items that Riddle had placed in storage and had sold to others were, in fact, taken from Horne's home. The stories diverge, however, on the matter of Riddle's access to his lawyer, Fred Lusk. The proof becomes important.
Riddle says Detective Williams reported that he had talked with Lusk and that Lusk had agreed that Riddle should go ahead and talk about the burglary. Riddle insists that Williams refused to let him talk directly to Lusk.
Williams acknowledges that Riddle asked him to call Lusk but says what happened is that he, Williams, placed the call to Lusk and then handed the telephone to Riddle. Lusk and Riddle talked briefly on the telephone, after which Riddle returned the telephone to Williams so that he and Lusk could talk. Williams explained the situation to Lusk, told Lusk what evidence the police had, and told him he would like to question Riddle about the Horne burglary. According to Williams, Lusk agreed, and Williams then handed the telephone back to Riddle, who talked further to Lusk. In the end, Riddle hung up and told Williams that he was willing to talk but that he would not allow the interview to be taped. Williams says he then advised Riddle of his Miranda rights and secured from Riddle a signed, written waiver of those rights. Riddle then confessed.
Lusk testified  at the eleven-months-later hearing held in December of 1987  that he had no independent recollection of this *1199 specific conversation with Detective Williams and Riddle. He acknowledged that he had represented Riddle on an unrelated matter beginning in December of 1986. He did recall talking to Detective Williams a number of times, including once about Riddle's personal property in connection with an unrelated charge. Lusk added that, as a matter of practice, he has found most of the Biloxi police officers will "shoot straight" with him, and if the case is fairly simple and if the officers have substantial evidence of guilt, he will regularly advise his client to go ahead and talk.[3] Lusk's theory is that this will benefit his clients when the time comes for plea bargaining or sentencing. He said he often does this over the telephone and in the manner described by Detective Williams although, as noted, he does not remember talking with Williams on this particular occasion.

C.
The law is seemingly settled. Once an individual is in custody and has invoked his right to counsel, interrogation must cease until a lawyer is present, at which point "the individual must have an opportunity to confer with the attorney and to have him present during any subsequent questioning." Miranda v. Arizona, 384 U.S. at 474, 86 S.Ct. at 1628, 16 L.Ed.2d at 723; Edwards v. Arizona, 451 U.S. 477, 484-85, 101 S.Ct. 1880, 1885, 68 L.Ed.2d 378, 386 (1981); Saucier v. State, 562 So.2d 1238, 1244 (Miss. 1990); Kirkland v. State, 559 So.2d 1046, 1047 (Miss. 1990). The accused's request for counsel raises, as a matter of law, a presumption "that he considers himself unable to deal with the pressures of custodial interrogation without legal assistance... ." Arizona v. Roberson, 486 U.S. 675, 683, 108 S.Ct. 2093, 2099, 100 L.Ed.2d 704, 715 (1988).
Minnick v. Mississippi, 498 U.S. ___, 111 S.Ct. 486, 112 L.Ed.2d 489 (1990), reaffirmed and reinforced Miranda, Edwards, and Roberson, stating:
... [A] fair reading of Edwards and subsequent cases ... bar[s] police-initiated interrogation unless the accused has counsel with him at the time of questioning. Whatever the ambiguities of our earlier cases on this point, we now hold that when counsel is requested, interrogation must cease, and officials may not reinitiate interrogation without counsel present, whether or not the accused has consulted with his attorney.

* * * * * *
We decline to remove protection from police-initiated questioning based on isolated consultations with counsel who is absent when the interrogation resumes.
Minnick, 498 U.S. at ___, 111 S.Ct. at 491, 112 L.Ed.2d at 498 [emphasis added]. The Court emphasized that the requirement that "counsel be `made available' to the accused refers to more than an opportunity to consult with an attorney outside the interrogation room." Minnick, 498 U.S. at ___, 111 S.Ct. at 490, 112 L.Ed.2d at 497.
The rule has a nuance  a caveat, if you will  we find equally settled. If the accused indicates in any manner that he wishes access to counsel, interrogation without counsel is allowed only if the accused himself initiates it. Minnick v. Mississippi, 498 U.S. at ___, 111 S.Ct. at 492, 112 L.Ed.2d at 499; Oregon v. Bradshaw, 462 U.S. 1039, 1046, 103 S.Ct. 2830, 2835, 77 L.Ed.2d 405, 412-13 (1983); Berry v. State, 575 So.2d 1, 6 (Miss. 1990); Saucier v. State, 562 So.2d at 1244; Kirkland v. State, 559 So.2d at 1047; Leatherwood v. State, 548 So.2d 389, 395 (Miss. 1989). We have never considered whether advice of counsel to submit to questioning qualifies *1200 as a reinitiation within the caveat to the rule.

D.
What makes the point worrisome is that the Circuit Court has given us no findings of fact, evidentiary or ultimate variety. At the end of the suppression hearing, the Court merely said, "Motion to suppress will be overruled," and that is all. We have repeatedly explained how this form of ruling places this Court "in an awkward position." See, e.g., McCarty v. State, 554 So.2d 909, 912 (Miss. 1989); Gavin v. State, 473 So.2d 952, 955 (Miss. 1985). It is difficult to review findings of fact when none have been made. This is particularly so in light of our charge to assure that the Court below employed the correct legal standard en route to ruling. Stokes v. State, 548 So.2d 118, 121 (Miss. 1989). Those standards are becoming increasingly intricate, as but a cursory reading of Miranda to Edwards to Roberson and now Minnick make clear.
Where findings of fact are fairly implicit in a trial court's ruling, we will credit those and grant them deference. Saucier v. State, 562 So.2d 1238, 1244 (Miss. 1990); Schmitt v. State, 560 So.2d 148, 151 (Miss. 1990); Cotton v. McConnell, 435 So.2d 683, 685 (Miss. 1983). This rule has limits, legal and logical. We may not credit unspoken findings not fairly inferrable from the trial court's action. Schmitt v. State, 560 So.2d at 151; Tricon Metals & Services, Inc. v. Topp, 516 So.2d 236, 238 (Miss. 1987); Pace v. Owens, 511 So.2d 489, 492 (Miss. 1987). We do not make up findings just to save a conviction.
We have carefully reviewed the transcript of Riddle's suppression hearing. It is apparent the Circuit Court credited the testimony of Detective Williams. Although Riddle's lawyer, Fred Lusk, at the hearing held eleven months after the fact, had no memory of this particular incident, Lusk's description of his custom and practice fit Williams' testimony. The Circuit Court, rationally, may only have found that on January 14, 1987, Lusk did what he says he customarily does. On appellate review, we respect and credit the Williams-Lusk view of the facts. See Stokes v. State, 548 So.2d 118, 122 (Miss. 1989). For the future, we implore our trial judges that, on issues like today's, they afford us adequate findings of fact. Tricon Metals & Services, Inc. v. Topp, 516 So.2d at 239.

E.
When we apply the law to the facts, we find equally troublesome whether Riddle's rights have been respected. Our point of concern is that Riddle never had counsel present with him during the custodial interrogation. Miranda to Edwards to Roberson to Minnick present an unbroken line of authority mandating the presence of counsel once the accused effectively claims his right. In today's circumstance, Miranda says "the interrogation must cease until an attorney is present." 384 U.S. at 474, 86 S.Ct. at 1628, 16 L.Ed.2d at 723. Edwards speaks of the accused's right "to have counsel present during custodial interrogation." 451 U.S. at 482, 101 S.Ct. at 1883, 68 L.Ed.2d at 384. Minnick adds, as we have noted:
[W]hen counsel is requested, interrogation must cease, and officials may not reinitiate interrogation without counsel present, whether or not the accused has consulted with his attorney.
Minnick, 498 U.S. at ___, 111 S.Ct. at 491, 112 L.Ed.2d at 498.
Taken literally, Minnick's language would require reversal. Today's facts, however, suggest a variation on Minnick's theme, for its spirit has been satisfied. Minnick requires access to and advice of counsel during interrogation. Contemporaneity is the touchstone. We see no reason on principle why telephonic access to counsel is legally less significant than eyeball-to-eyeball access. The point is that Riddle was given the opportunity to confer with counsel who advised him to confess. This advice came from counsel of Riddle's choice. When Riddle acted on this advice, he "reinitiated" discussion of the charge against him. Minnick v. Mississippi, 498 U.S. at ___, 111 S.Ct. at 492, 112 L.Ed.2d at 499; Oregon v. Bradshaw, 462 U.S. at *1201 1046, 103 S.Ct. at 2835, 77 L.Ed.2d at 412-13.
What Ellen Brown told the police plus the evidence the search warrant had yielded made clear that Riddle was well on his way to conviction. Fred Lusk's customary strategy in such circumstances proceeded on the premise his client would gain at plea bargaining and at sentencing if he cooperated with the authorities. Steven Edward Riddle confessed on advice of counsel. This advice  and not the inherently coercive atmosphere of lawyerless custodial interrogation  became the producing agent proximately generating the confession. Riddle's rights were respected and his confession was admissible.

V.
Riddle argues next that he was denied effective assistance of counsel. He points to his custodial interrogation at the hands of Detective Williams and says Lusk's assistance was ineffective on grounds he advised Riddle to confess.
We find the law in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), followed by this Court in Stringer v. State, 454 So.2d 468 (Miss. 1984), and many other decisions. To secure relief on grounds of ineffective counsel, the defendant must make a two-pronged showing:

First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable. [emphasis added]
Strickland, 466 U.S. at 687, 104 S.Ct. at 2064, 80 L.Ed.2d at 693; Stringer v. State, 454 So.2d 468, 477 (Miss. 1984).
Riddle claims Lusk, by telling him to go ahead and talk to the police without coming down to the police station or further assisting him, assisted him ineffectively and unconstitutionally so. This Court does not appear to have directly addressed the point. In Phelps v. State, 435 So.2d 158, 161 (Ala. Crim. App. 1983), the court stated, "[e]rroneous, incomplete, or poor advice or consultation regarding an accused's pretrial silence may demonstrate and support a finding of inadequate assistance of counsel. [citation omitted] However, the mere fact that counsel advises the accused to make a statement to the police does not constitute inadequate representation as a matter of law." A Pennsylvania court in Commonwealth v. Kesting, 274 Pa.Super. 79, 417 A.2d 1262 (1979), found that the absence of the attorney from the interrogation of the defendant did not, of itself, render the assistance ineffective since a defendant may waive the presence of counsel during interrogation. Inculpatory statements made after the accused has been fully advised of his constitutional rights and has made a knowing, voluntary and legally effective waiver, were fully admissible even though made in the absence of counsel. Kesting, 417 A.2d at 1265.
Riddle has the burden of persuasion, first, that Lusk's performance was deficient. We are not about to hold it per se professionally unreasonable for a lawyer to allow a client to talk to the police and give a statement. Where the evidence is otherwise overwhelming, confession may be a significant step toward prompt disposition of the case and mitigation of sentence. We are troubled that Lusk did this over the telephone, though it does appear he brought to bear independent scrutiny and judgment before advising Riddle. Because the evidence against Riddle was and is so overwhelming, we see no ground for finding Lusk's advice processionally erroneous.
Beyond this, Riddle's claim flunks the prejudice test. In view of the whole record, Lusk's allowing him to talk to police *1202 and make an inculpatory statement was not so serious that it deprived Riddle of a fair trial, nor that the trial's result was unreliable. Riddle has not shown that the outcome would probably have been different, "but for" the minimal level of representation he received from counsel, if he had not given the statement to police.

VI.
Riddle finally argues that the Circuit Court erred when it overruled his motion for a mistrial made during the course of jury deliberations. The record reflects that, some two and a half hours after deliberations began, the jurors sent a message via the bailiff that they were unable to arrive at a verdict. The Court brought the jurors out and asked the foreman how they were divided but told him not to reveal how many jurors were voting for what verdict. The foreman said they were split "nine and three, Your Honor. Nine guilty " The Court interrupted immediately and readmonished the foreman not to reveal how the split stood. The Court then asked all jurors to read over the instructions and discuss the case and see if they could reach a verdict. The Court told the jury it would not keep them out all day. About thirty minutes later, the jury returned a guilty verdict. The jury was polled, and all jurors affirmed the verdict.
The Circuit Court may request the numerical division of the jury without committing reversible error. Folk v. State, 576 So.2d 1243, 1249 (Miss. 1991); Martin v. State, 415 So.2d 706, 708 (Miss. 1982); Sharplin v. State, 330 So.2d 591, 596 (Miss. 1976). Sharplin said that, if the court felt there was a likelihood the jury might reach a verdict, it could return the jurors for more deliberations but should not give them the so-called Allen charge. Sharplin, 330 So.2d at 596. The length of jury deliberations lies within the court's sound discretion. Martin, 415 So.2d at 708; Dixon v. State, 306 So.2d 302 (Miss. 1975). In Nicholson v. State, 523 So.2d 68, 75 (Miss. 1988), we affirmed on a like point after saying, "[t]he trial judge in this case was very careful to warn the foreman of the jury not to tell him how many were for guilty or not guilty."
In the case at hand, the Circuit Court did instruct the foreman not to indicate in which direction the split was. The foreman, apparently inadvertently, said, "Nine guilty... ." He did not indicate which jurors were voting which way. The Court did not order the jury to come back with a verdict, nor utilize any other impermissibly coercive measures. The Court merely asked the jurors to consider the instructions and evidence and attempt to reach a verdict if they could. The jurors were told they would not be kept out all day but were merely asked to make another effort to reach a verdict. The Court did not abuse its discretion in its handling of this matter. Contrast Folk v. State, 576 So.2d 1243, 1249 (Miss. 1991).
CONVICTION OF BURGLARY OF A DWELLING AND SENTENCE OF TEN YEARS IN CUSTODY OF MISSISSIPPI DEPARTMENT OF CORRECTIONS AFFIRMED.
ROY NOBLE LEE, C.J., HAWKINS and DAN M. LEE, P.JJ., and PRATHER, PITTMAN and McRAE, JJ., concur.
BANKS, J., concurs with separate written opinion joined by SULLIVAN, J.
BANKS, Justice, concurring:
I concur in the judgment because Riddle has not shown that his lawyer's failings caused him prejudice. I write specially to note that while I agree with the majority that it is not professionally unreasonable per se to allow a criminal defendant client to give a statement, it is, in my view, unreasonable per se to advise such a client to submit to interrogation in the attorney's absence.
SULLIVAN, J., joins this concurring opinion.
NOTES
[1] The shelter's actual location is confidential.
[2] Miranda v. Arizona, 384 U.S. 436, 474, 86 S.Ct. 1602, 1627-28, 16 L.Ed.2d 694, 726 (1966); Rule 1.03, Miss.Unif.Crim.R.Cir.Ct.Prac. (1979); Kirkland v. State, 559 So.2d 1046, 1047 (Miss. 1990).
[3] Lusk's testimony at trial on this point is:

If I was putting a percentage on it, I would say in about 75 percent of my cases I would talk to the officers and most of the officers shoot fairly squarely with me because I deal with them or whatever and they tell me what they have. Then I ask to talk to the client who usually tells me some kind of way  you know, we don't talk much because it's a taped line. And then I either come or don't come. Most of the time I do not come because, you know, the police feel guarded and I much rather walk in here  if they have my client dead to rights, I'd much rather walk in here saying my guy cooperated.