FAIR, J.,
for the Court:
¶ 1. Richard Barnes was shot and killed outside a party in rural Lawrence County, Mississippi. His brother, Ricardo Barnes, cousin, Shamel Lewis, and friend Murphy Peyton were also shot but survived. Prosecution witnesses identified five shooters and two other participants. Four of these were brought to trial together — Jason Davis, Leon Hayes, April Garner, and Charles Ford. They were jointly indicted on charges of murder, conspiracy to commit murder, and three counts of aggravated assault — one for each surviving victim. All the defendants were acquitted of murder. Davis was convicted of all the remaining counts. Hayes was convicted of *1069 conspiracy and one count of aggravated assault. Garner was convicted of conspiracy. The jury could not reach a verdict on Ford’s conspiracy charge.[1] Hayes, Garner, and Ford were acquitted of the remaining charges.
¶ 2. Davis, Hayes, and Garner’s appeal is now before this Court. We find no merit to any of their issues, so we affirm all of the convictions and sentences.
FACTS
¶ 3. The chain of events leading up to the shootings began when Bryan Cauthen, a relative of some of the defendants, allegedly insulted and struck Murphy Peyton’s sister. Peyton and Ricardo Barnes went to Andy’s, a local convenience store, and met Cauthen, Jason Davis, and Kabaska Polk. The two groups argued until the store owner called the police, when they left. During the argument Jason Davis threatened Barnes and Peyton by saying “we’ll see you later.”
¶ 4. A few days later, the night of November 7, 2008, Ricardo Barnes encountered Bryan Cauthen and Jason and Joel Davis at Leo’s, a club. Barnes heard someone say, “we got you now,” and the trio “jumped” Barnes. As Barnes wrestled with his assailants, they punched and kicked him. Jason Davis held something sharp to Barnes’s neck, which cut him. Barnes overheard someone say Jason had a gun, but he never saw what it was. The fight broke up when Barnes’s friends interceded, and Jason again said “we’ll get you later.”
¶ 5. Barnes testified that he did not understand why Cauthen and the Davises still wanted to hurt him, and he wanted to clear it up with them. So Barnes called his brother, Richard, and they, along with Lewis and Peyton, went back to Leo’s in Richard’s car, a Toyota. The police were there because of the fight, however, so they went to a “party” at “Rose Hill,” an establishment in rural Lawrence County that consisted of two mobile homes arranged in an “L” shape with a burn barrel between them.[2] Alcohol was sold, loud music was playing, and there was a pool table inside one of the trailers. Visitors parked their vehicles on the sides of the narrow road. There was a single security light illuminating the area inside the “L.”
¶ 6. When the Barneses arrived, Garner was blocking the road with her vehicle. Richard stopped his Toyota in the middle of the road. He asked Garner to move,’ and she refused. The Barnes group saw a black Tahoe, which they recognized. The Barneses, Lewis, and Peyton got out and approached the Tahoe.[3] Richard Barnes knocked on the driver’s window, but Ricardo became alarmed when he saw Bryan Cauthen crawling to the back of the vehicle. Richard asked Cauthen to come out, but Cauthen came up with a gun and shot Richard through one of the rear side windows. Richard went down, and Ricardo, Lewis, and Peyton fled back into Richard’s Toyota. Both Lewis and then Peyton tried to drive it away, but neither was able to get the vehicle into gear. As the victims sat immobile, Cauthen was joined by Kabaska Polk and Joel and Jason Davis, *1070 who were all armed and began firing into the Toyota.
¶ 7. Eventually, Ricardo, Lewis, and Peyton decided to flee on foot. They jumped out when they believed their assailants were reloading and ran in different directions. Leon Hayes, who had been standing behind a pine tree on the side of the road, shot Peyton with a shotgun'when he came out of the car. Though each was hit by shot or bullets, Ricardo, Lewis, and Peyton all made it into the woods, and they were able to evade their pursuers in the darkness. At some point, Cauthen (and possibly Joel and Jason Davis) stood over Richard Barnes’s body and fired into it repeatedly, as Cauthen asked Richard when he was going to die. After his attackers gave up the chase and fled, Ricardo returned to check on Richard.[4] The first responder to the scene found Ricardo lying over his brother’s body.
¶ 8. After he escaped, Peyton hid in the bushes behind a nearby house. Sometime later, April Garner and her mother drove up in the same vehicle Garner had been driving at the time of the shooting. Pey-ton believed they saw him, and Garner stepped out from the passenger’s side. Garner called for Peyton to come out and asked aloud where he had gone. She used profane language Peyton interpreted as threatening, and Peyton remained hidden until they left.
¶ 9. Shamel Lewis, the fourth victim, did not testify at the trial, but his injuries were described by other witnesses.
¶ 10. Eric Smith, a witness, recounted the assailants being armed as follows: “Bryan had a handgun. Jason had a handgun. Leon had a shotgun. Charles had a shotgun. Kabaska had a shotgun. And Joel had an AK(-47).” Investigators found evidence of at least three weapons having been fired: spent casings from an AK-47-type rifle, a hull from a 12-gauge shotgun shell, and a wadding from a .410 shotgun shell. None of the guns were ever recovered, however. Richard Barnes, the deceased, was found to have had a .25-caliber handgun in his pocket, but there was no evidence introduced at trial that it played any role in the incident.
¶ 11. Cauthen pled guilty to manslaughter, and Kabaska Polk pled guilty to accessory after the fact. Some of the defendants’ theories of the case were that Cauthen and Polk were solely responsible for the shooting. Joel Davis was not tried because he was being held on other charges in Louisiana.
¶ 12. Three of the four defendants were convicted of at least one count, as we have detailed above. Jason Davis was sentenced on each of his four counts to twenty years’ imprisonment, with fifteen to serve and five years of post-release supervision. His aggravated assault sentences were ordered to run concurrently to each other, but consecutively to the conspiracy sentence. Garner and Hayes received the same sentence as Davis for each of their convictions, with Hayes’s two sentences to be served consecutively.
DISCUSSION
¶ 13. Before us are three of the defendants from the joint trial. Each defendant raises distinct issues, but we shall discuss them together when appropriate.
1. Weight of the Evidence — Hayes
¶ 14. Hayes contends his convictions for conspiracy and aggravated as *1071 sault were against the overwhelming weight of the evidence. A challenge to the weight of the evidence will be successful only when the verdict “is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice.” Bush v. State, 895 So.2d 886, 844 (¶ 18) (Miss.2005). The evidence must be viewed in the light most favorable to the verdict, and a new trial should be granted “only in exceptional cases in which the evidence preponderates heavily against the verdict.” Id. The motion for a new trial is entrusted to the trial judge, who had a first-hand view of the trial. “[Reversal] is warranted only if the trial court abused its discretion.... ” Ivy v. State, 949 So.2d 748, 753 (¶ 21) (Miss.2007).
¶ 15. One is guilty of aggravated assault under Mississippi Code Annotated section 97 — 3—7(2)(a)(ii) (Supp.2012) if he “attempts to cause or purposely or knowingly causes bodily injury to another with a deadly weapon or other means likely to produce death or serious bodily harm.... ”
¶ 16. Hayes acknowledges that three witnesses, Eric Smith, Shericka Pey-ton Buckley, and Murphy Peyton, all testified that he was firing a shotgun from behind a big pine tree near the road. Murphy Peyton testified that Hayes shot him with the shotgun after he got out of the car to flee. This testimony was corroborated by a spent shotgun shell which was recovered near the tree and by some of Peyton’s wounds that were attributed to a shotgun. A fourth witness, Darmisha Peyton; Murphy Peyton’s cousin, saw Hayes with the shotgun shortly before the shooting. She testified that Hayes looked into her car and “smirked” as she drove by-
¶ 17. Hayes points out in his brief that he was not present at the prior altercations between some members of the two groups. He also notes that Ricardo Barnes, the other victim who testified, did not see Hayes shooting and that Murphy Peyton, who testified at trial that Hayes shot him, failed to mention it in his first statement, taken while Peyton was in the hospital shortly after the shooting. Hayes contends that these “inconsistencies raise a serious question of the credibility and weight to give the evidence.”
¶ 18. We note that the testimony was that Hayes was behind a large tree before he shot Peyton, which might explain why Barnes did not see him — especially since several other people were shooting at Barnes at the time. Also, Murphy Peyton explained that his first statement was rushed because it was taken while he was in the hospital and still suffering from his wounds.
¶ 19. Crucially, “the credibility of witnesses is not for the reviewing court.” Hughes v. State, 735 So.2d 238, 277 (¶ 177) (Miss.1999) (citation omitted). The Mississippi Supreme Court “has in numerous cases, too many to mention, said that when the evidence is conflicting, the jury will be the sole judge of the credibility of witnesses and the weight and worth of their testimony.” Id. at 276 (¶ 177). Given the evidence noted above, Hayes’s conviction for aggravated assault is not against the overwhelming weight of the evidence.
¶20. Conspiracy occurs when “two or more persons conspire ... [t]o commit a crime.” Miss.Code Ann. § 97-1-1(1)(a) (Supp.2012). Agreement to commit a crime is a completed offense; it is not required that there be an overt act in furtherance of the conspiracy. Ford v. State, 546 So.2d 686, 688 (Miss.1989) (citations omitted). Each conspirator “must intend a common plan and know its common purpose.” Id. But the agreement “need not be formal or express, [and] may be inferred from the circumstances, partic *1072 ularly by declarations, acts, and conduct of the alleged conspirators.” Id. Thus, conspiracy can be proven entirely by circumstantial evidence. Davis v. State, 485 So.2d 1055, 1058 (Miss.1986).
¶21. Hayes’s argument on the conspiracy count is largely the same—that the witnesses were not credible and there is no direct proof of his participation in a conspiracy. However, there is strong circumstantial evidence of a prior understanding to kill in the coordinated actions of the participants. Hayes and four other men were armed in advance, and all fired on the victims. A sixth, Ford, was armed but not seen shooting, and a seventh participant, Garner, blocked the victims with her car before the shooting started and came back to get Hayes afterwards. Shortly before the shooting Hayes was seen speaking with Garner and Kabaska Polk, one of the shooters. Hayes also “smirked” at a relative of one of his victims while holding a shotgun, again only a few minutes before the shooting. Taking this evidence together, we conclude that Hayes’s conspiracy conviction is not against the overwhelming weight of the evidence.
¶ 22. Hayes also contends the verdict was the product of prejudice from the joint trial, but we shall address that argument later, under the severance issue.
2. Sufficiency of the Evidence—Garner
¶ 23. Garner contends her conviction for conspiracy to commit murder is not supported by sufficient evidence. This analysis is similar to, but distinct from, a challenge to the weight of the evidence. The inquiry as to sufficiency is whether the evidence shows “beyond a reasonable doubt that [the] accused committed the act charged, and that he did so under such circumstances that every element of the offense existed; and where the evidence fails to meet this test it is insufficient to support a conviction.” Bush v. State, 895 So.2d 836, 843 (¶ 16) (Miss.2005) (citation omitted). “[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.” Id. (quoting Jackson v. Virginia, 443 U.S. 307, 315, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)). We reiterate that conspiracy can be proven entirely by circumstantial evidence. Davis, 485 So.2d at 1058.
¶24. A few minutes before the shooting, Shericka Peyton Buckley saw Hayes take his shotgun from Garner’s vehicle. A short time after that, Darmisha Peyton saw Garner in her mother’s silver Ford Expedition with shooters Kabaska Polk and Leon Hayes. Hayes was holding the shotgun.
¶ 25. Eric Smith, Garner’s uncle, testified that shortly before the victims arrived, he saw Garner drive her vehicle up and down the street, and, at Kabaska Polk’s instruction, Garner moved it into the middle of the road between two other vehicles that were parked on either side of the road, blocking the victims’ vehicle from moving forward. Garner then looked intently in her rear-view mirror, toward the victims’ vehicle. Richard Barnes said something to her about his vehicle being blocked, and he then moved toward Cau-then’s vehicle. According to Smith, Garner drove away immediately after Cauthen opened fire.
¶ 26. Shericka Peyton Buckley’s testimony regarding Garner’s actions was similar, albeit more inculpatory. According to her, Garner blocked the road with her vehicle oriented sideways. Richard Barnes told Garner to move her vehicle *1073 and she refused. Buckley also described Garner as leaving somewhat later, actually driving over Richard and Ricardo Barnes as they lay on the ground after the shooting.[5]
¶27. It was uncontested that Garner drove Leon Hayes away from the scene, as her mother, a defense witness, described her returning home with Hayes. There was also Murphy Peyton’s-testimony that Garner returned to the scene later, with her mother, and that Garner was looking for him while cursing him and otherwise speaking about him in a way he interpreted as threatening. It was noted also that Garner knew shooters Jason and Joel Davis because they were her uncles, and Bryan Cauthen was Garner’s cousin.
¶ 28. The main thrust of Garner’s argument on appeal is that the victims’ testimony did not match the State’s theory of the case against her; neither Ricardo Barnes nor Murphy Peyton recalled Garner blocking the road. She also cites to the testimony of her mother and brother, who placed her at the scene only a short time before the shooting. Garner emphasizes that she was not shown to have been present at or even aware of any of the prior encounters. She also notes that she was much younger than the shooters; Garner was nineteen at the time, while the others were all in their thirties. The youngest shooter, Kabaska Polk, was almost twelve years her senior. Garner also points out that Ricardo testified the victims went looking for Cauthen and that both Ricardo and Murphy admitted their original destination was Leo’s rather than Rose Hill. Garner contends there is no way she could have known the Barnes group was on its way, so she could not be seen as deliberately blocking the road ahead of time. Garner’s theory of the case was that the shooting was spontaneous and that there was no prior agreement. She also contends her mother was a nurse and suggests that if they were looking for Murphy Peyton after the shooting, it was to help him.
¶ 29. The flaw in Garner’s argument is our standard of review, which requires this Court to view the evidence in a light most favorable to the prosecution. Moreover, “the credibility of witnesses is not for the reviewing court.” Hughes, 735 So.2d at 277 (¶ 177). Thus it has been “repeatedly held that in a criminal prosecution the jury may accept the testimony of some witnesses and reject that of others, and that they may accept in part and reject in part the evidence on behalf of the state or on behalf of the accused.” Id. at 276-77 (¶ 177). We are required to accept the best case against Garner that can be assembled from the State’s proof; in fact, we must “disregard the evidence favorable to the defendant.” Robinson v. State, 940 So.2d 235, 240 (¶ 13) (Miss.2006).
¶ 30. Garner was shown to be related to three of the shooters and was seen speaking with two others immediately before the shooting. All of the shooters had armed themselves in advance after prior confrontations with the victims, including Leon Hayes, who was seen armed in Garner’s vehicle. Garner followed Kabaska Polk’s instruction to block the road immediately after some of Murphy Peyton’s relatives arrived. When the Barnes crew arrived, Garner refused Richard Barnes’s request to move, ensuring that the victims would *1074 be exposed to the attack. It does not matter whether Garner continued to block the surviving victims’ escape as the shooting continued, but Shericka Peyton Buck-, ley’s testimony that she did must be believed. Garner then drove one of the shooters away from the scene, and she returned later to look for Murphy Peyton while evidencing hostile intent.
¶ 31. Garner contends that her actions were ineffective and that she “abandoned” any conspiracy by driving away after the shooting started. She paints herself as an innocent bystander caught up in a conflict between two groups of older men. But Garner’s argument relies on this Court accepting her favored version of conflicting evidence, which would violate our standard of review. Garner also misunderstands the nature of conspiracy, which is a completed offense when the agreement is made. See Ford, 546 So.2d at 688. Even if Garner had “chickened out” and left when the shooting started, she could not abandon the conspiracy — particularly since she had already set the victims up to be shot.
¶ 32. It was the jury’s province to decide whose testimony to believe and what inferences to draw from the evidence. Goff v. State, 14 So.3d 625, 650 (¶ 97) (Miss.2009). On appeal we must affirm the jury’s decision when there is sufficient evidence; we must give the State the benefit of all favorable inferences that can be reasonably drawn from the evidence. Hughes v. State, 983 So.2d 270, 276 (¶ 11) (Miss.2008). Garner’s actions before, during, and after the shooting evidence participation in a plan to shoot and kill Ricardo Barnes, Murphy Peyton, and anyone supporting them — including Richard Barnes. Garner’s argument that her conspiracy conviction is unsupported by sufficient evidence is without merit.
3. Severance
¶ 33. Garner and Hayes both contend the circuit court erred in refusing to sever their trials.
¶ 34. “Defendants jointly indicted for a felony are not entitled to separate trials as a matter of right.” Carter v. State, 799 So.2d 40, 44 (¶ 13) (Miss.2001). On the contrary, “£j]oint trials generally serve the interests of justice by avoiding inconsistent verdicts and enabling more accurate assessment of relative culpability — advantages which sometimes operate to the defendant’s benefit.” Cavett v. State, 717 So.2d 722, 727 (¶ 30) (Miss.1998) (quoting Richardson v. Marsh, 481 U.S. 200, 210, 107 S.Ct. 1702, 95 L.Ed.2d 176 (1987)). A trial court’s denial of a motion to sever will not be overturned on appeal absent an abuse of discretion. King v. State, 857 So.2d 702, 716 (¶ 19) (Miss.2003); URGCC 9.03. Severance is required only when it “is necessary to promote a fair determination of the defendant’s guilt or innocence.” Carter, 799 So.2d at 44 (¶ 13). The two criteria to be considered in reviewing the denial of a severance are (1) “whether ... the testimony of one co-defendant tends to exculpate that defendant at the expense of the other defendant” and (2) “whether the balance of the evidence introduced at trial tends to go more to the guilt of one defendant rather than the other.” Hawkins v. State, 538 So.2d 1204, 1207 (Miss.1989). A showing of prejudice from the failure to grant severance is required to secure reversal on appeal. See id.

A. Hayes

¶ 35. Hayes makes several points in his argument for a severance. He contends that the evidence against Jason Davis was stronger because Davis was present during the prior altercations with the victims, while Hayes was not. Hayes *1075 also contends he was prejudiced by Davis’s cross-examination of Eric Smith, where Davis’s attorney brought out the fact that Smith, who identified Davis as one of the shooters in court, had omitted Davis in a prior statement to the authorities. The trial court permitted Davis to impeach Smith on the failure to mention Davis, but to protect the other defendants, the court refused to admit the statement into evidence. Even though Hayes’s attorney stated he had “no objection to using the statement” as long as it was not admitted into evidence, on appeal Hayes now contends he was prejudiced by the implication that Smith had made a prior consistent statement identifying Hayes as a shooter.
¶ 36. There may be some small merit to Hayes’s arguments, but after reviewing the record, we conclude that any prejudice Hayes may have suffered from the joint trial does not rise to the level of reversible error. There was testimony Hayes was armed in advance, and three witnesses saw him firing a shotgun from behind a tree. A spent shotgun shell found near the tree corroborated this testimony. The concerns Hayes raises are minor, and a severance would have changed almost nothing in the evidence that would have been presented to the jury in his trial. In Sanders v. State, 942 So.2d 156, 162 (¶ 30) (Miss.2006), the supreme court emphasized that the real test for severance is prejudice: “Significantly, even if this Court should find that each defendant had exculpated herself at the expense of the other, absent a showing of prejudice, there are no grounds to hold that the trial court abused its discretion.” (Citation omitted).
¶ 37. Hayes also suggests he was prejudiced because he was unable to call his codefendants as witnesses, but this argument is not developed. Moreover, he has never proffered any testimony to substantiate this claim.
¶ 38. Hayes has failed to show he was prejudiced by the joint trial. His arguments are without merit.

B. Gamer

¶ 39. Garner offers two distinct arguments on this point. Her first is that the trial court’s decision must be reversed solely because the court failed to make detailed findings of fact and conclusions of law in support. She cites to Riddle v. State, 580 So.2d 1195, 1200 (Miss.1991), where the supreme court faulted a trial court for failing to explain its ruling on a motion to suppress a defendant’s confession. The supreme court noted that it could credit findings of fact that are implicit in a trial court’s ruling, but it would not “make up findings just to save a conviction.” Id. The supreme court affirmed Riddle’s conviction, but it implored trial judges to make adequate findings of fact “on issues like today’s.” Id.
¶ 40. Riddle is inapposite because that case involved the resolution of conflicting testimony in a complicated ruling that necessitated both findings of fact and conclusions of law. Today’s case did not require the trial judge to resolve conflicting testimony.
¶ 41. Garner’s second argument is that the balance of the evidence tilted toward her codefendants. She notes that two of her codefendants, Hayes and Davis, were seen shooting at the victims, while she was alleged only to have blocked their vehicle. Shooting at the victims was direct and unmistakable in its intent, while Garner at least had a colorable argument that her actions were innocent.
¶ 42. Garner relies on Shephard v. State, 66 So.3d 687, 693-695 (¶¶ 22-30) (Miss.Ct.App.2011), where Shephard’s co-defendant testified that she had handed him a pistol he then used to shoot some *1076 one, contradicting his prior statements to the authorities. Shephard was convicted of aggravated assault on an accomplice liability theory. On appeal, this Court reversed because the codefendant had unexpectedly implicated Shephard in an attempt to exculpate himself of having brought the gun to the fight. See id. at 694-95 (¶¶ 28-29).
¶ 43. Shephard is not controlling in this case. That the evidence against the code-fendant was stronger was only a factor supporting the decision; the critical fact there was that one codefendant had unexpectedly implicated the other in his testimony. The supreme court has held that “where the testimony of one defendant did not tend to exculpate himself at the expense of another and there does not appear to be a conflict of interest among the co-defendants, severance is not required.” Carter, 799 So.2d at 45 (¶ 17) (citing Duckworth v. State, 477 So.2d 935, 937 (Miss.1985)).
¶ 44. As the supreme court emphasized in Sanders, 942 So.2d at 162 (¶ 30), the key to a successful argument for severance is prejudice. Garner argues she suffered prejudice through “guilt by association,” but she does little to develop this argument beyond contending that her codefen-dants were more clearly implicated as participants in the shooting. While it is true that the balance of evidence is one factor to be considered in deciding whether to grant a severance, the flaw in Garner’s reasoning is that she was charged with conspiracy; the actions of her coconspira-tors would be relevant and admissible even if she were tried alone. Garner cannot point to any evidence the jury would not have received if she had been tried separately.
¶ 45. Garner has not shown she suffered any prejudice from the joint trial. This issue is without merit.
4. Witness Longino
¶ 46. Garner, Hayes, and Davis all complain of Judge Harrell’s handling of a prosecution witness, Stephanie Longino. She testified briefly that she knew the defendants before becoming nonresponsive as the prosecutor repeatedly asked her whether she was at the scene of the shooting, in Joel Davis’s car. Longino did not ánswer, and the court excused her for a time to “recompose herself.” After Longi-no’s left the stand, the defendants moved for a mistrial, which the trial court denied.
¶ 47. The next day, after a few other witnesses had testified, Longino was recalled. This time, she admitted to being at the scene with Joel Davis (she called him “Joey”). She said she was “friends” with Joel and that the night before she had “hung out” with him and Bryan Cauthen. The prosecutor asked leading questions such as “Had they made any kind of plans?” and “Did you see Joey or Bryan put guns in that car?” that elicited no response. After Longino remained mute through some subsequent, unremarkable questions, the State ended its direct examination. The defendants asserted that cross-examination was futile, and the trial court granted an unopposed defense motion to instruct the jury to disregard Lon-gino’s testimony entirely. The court then denied the defendants’ renewed motion for a mistrial.
¶ 48. The defendants’ issue on appeal is not with what Longino said, or even with the questions that were directed to her, but with the atmosphere in the courtroom, which the defendants claim led the jury to believe Longino had been threatened by them.
¶ 49. When Longino testified the first time, she was escorted into the courtroom by a man who “stood by the bar,” and the *1077 bailiff stood behind her. Defense counsel characterized the bailiff as looking like an “armed guard,” a characterization the trial court strongly disagreed with. The prosecutor stated that the second man was someone Longino knew and trusted, whose presence he hoped would help her feel more comfortable testifying.
¶ 50. The defendants also fault Judge Harrell for trying to comfort Longino in view of jury (but outside their hearing); and they complain that before releasing Longino from her first day’s testimony, the judge told her (in open court) that she “had nothing to be fearful of.”[6]
¶ 51. The defendants complain of the judge’s admonishment to the audience, which came after Longino’s first attempt at testifying. The judge stated:
I am going to take this opportunity to instruct members of the audience, and albeit I cannot specifically speak to members of the community, but I think that people who are here can convey that. We’ve had an obviously very emotional, difficult, terrible tragedy that has occurred in our county. We are here in a somber, solemn courtroom for the administration of justice. Anything that is done outside of this courtroom is prohibited. We’re going to conclude this matter in this courtroom. If any witness is intimidated by glares, facial figures, conversation, if there’s any telephone conferences and that’s reported to the Court, I will take that extremely serious.
The integrity of this trial, the integrity of our judicial system is critically important. We’ve already had one terrible fight in the street that we have people dead. We’re going to conclude this matter in this courtroom, and there will be no conversation with anybody outside this room. I hope everybody understands that. There better not be any threats, telephone calls, anything.
Outside the hearing of the jury, the judge explained this to defense counsel as follows:
[T]hat admonition was made in a neutral manner to both sides. The victims are here on one side; the defendants are on the other side. And there already has been multiple glares. You may have had your back to them, but I haven’t. And I am not going to put up with any emotionalism in this courtroom.
¶ 52. Finally, the defendants fault the trial judge for a display of emotion, although it is unclear exactly what occurred. The only evidence of emotion on the record came from Hayes’s attorney, who after the first day’s testimony, during his first argument for a mistrial, stated: “[T]he long conversation with the witness and then the Court, you were crying, that hurts.” The judge did not appear to acknowledge this particular claim when he addressed the attorney’s argument. The conversation the attorney referenced took place outside the hearing of the jury, and the record betrays no emotionalism from the judge.[7]
¶ 58. It is certainly true that:
*1078 [J]urors, as well as officers in attendance upon court, are very susceptible to the influence of the judge. The sheriff and his deputies, as a rule, are anxious to do his bidding; and jurors watch closely his conduct, and give attention to his language, that they may, if possible, ascertain his leaning to one side or the other, which, if known, often largely influences their verdict. He cannot be too careful and guarded in language and conduct in the presence of the jury, to avoid prejudice to either party.
Green v. State, 97 Miss. 834, 838, 53 So. 415, 416 (1910) (citation omitted). And “[t]he trial judge always’ must be circumspect and unbiased, at all times displaying neutrality and fairness in the trial, and consideration for the constitutional rights of the accused.” Simmons v. State, 746 So.2d 302, 307 (¶22) (Miss.1999). And an appellate court “will not hesitate to reverse where the trial judge displays partiality, becomes an advocate, or, in any significant way, conveys to the jury the impression that he has sided with the prosecution.” Jones v. State, 669 So.2d 1383, 1387 (Miss.1995) (citation omitted). “The right to a fair trial includes the right to a verdict based on the evidence and not extraneous prejudicial happenings in and around the courtroom.” Boches v. State, 506 So.2d 254, 262 (Miss.1987).
¶ 54. We can find no reversible error in the record. The trial judge was in a far better position than this Court to decide whether the bailiff or the man standing at the bar appeared to be out of place and whether the jury was improperly influenced by whatever emotion the judge may have displayed. Moreover, the trial court has a responsibility to “maintain order and suppress any disturbance which might prejudice the rights of either side.” Balfour v. State, 598 So.2d 731, 756 (Miss.1992). The trial judge said on the record that he had observed glares from the audience and an atmosphere of tension; and the admonishment did not single out supporters of either the victims or the accused, nor did it imply any misconduct on the part of the defendants. There is no basis in the record for this Court to find that the trial judge suggested the defendants had threatened Longino.
¶ 55. The decision of whether to grant a mistrial is entrusted to the sound discretion of the trial court. Morgan v. State, 117 So.3d 619, 622 (¶ 12) (Miss.2013). We can find no abuse of that discretion. This issue is without merit.
5. Ineffective Assistance of Counsel — Davis
¶ 56. In our final issue, Davis contends he received constitutionally ineffective assistance of counsel. Davis contends his counsel failed to secure alibi witnesses, failed to make certain objections, and employed an erroneous strategy in choosing to reveal to the jury that Bryan Cauthen *1079 and Kabaska Polk had pled guilty to crimes in connection with the shooting.
¶ 57. Mississippi Rule of Appellate Procedure 22(h) provides that issues such as ineffective assistance of counsel, which may be raised in post-conviction-relief proceedings,- can be raised on direct appeal only “if such issues are based on facts fully apparent from the record.” Under Strickland v. Washington, to succeed on an ineffective assistance of counsel claim, Davis would have to show (among other things) that “but for counsel’s unprofessional errors, the result of the proceeding would have been different.” Hannah v. State, 943 So.2d 20, 24 (¶ 6) (Miss.2006) (citing Strickland v. Washington, 466 U.S. 668, 687-88, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)).
¶ 58. We cannot say that the result would have been different when the credibility of the alleged alibis would have been at issue in the trial, particularly since the record contains only a third-hand proffer of what Davis had told his attorney they would testify to. We therefore conclude the facts upon which this assertion of error is based are not fully apparent from the record, and we deny relief on Davis’s ineffective assistance of counsel claim without prejudice to a future post-conviction proceeding.
¶ 59.a DAVIS: THE JUDGMENT OF THE CIRCUIT COURT OF LAWRENCE COUNTY OF CONVICTION OF COUNT 1, CONSPIRACY, COUNT 3, AGGRAVATED ASSAULT, COUNT 4, AGGRAVATED ASSAULT, AND COUNT 5, AGGRAVATED ASSAULT, AND SENTENCE ON EACH COUNT OF TWENTY YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, WITH FIVE YEARS SUSPENDED AND FIVE YEARS OF POST-RELEASE SUPERVISION, WITH THE SENTENCES IN COUNTS 3, 4, AND 5 TO RUN CONCURRENTLY TO ONE ANOTHER BUT CONSECUTIVELY TO THE SENTENCE IN COUNT 1, AND A $1,000 FINE, IS AFFIRMED. HAYES: THE JUDGMENT OF THE CIRCUIT COURT OF LAWRENCE COUNTY OF CONVICTION OF COUNT 1, CONSPIRACY, AND COUNT 4, AGGRAVATED ASSAULT, AND SENTENCE ON EACH COUNT OF TWENTY YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, WITH FIVE YEARS SUSPENDED AND FIVE YEARS OF POST-RELEASE SUPERVISION, WITH THE SENTENCES TO RUN CONSECUTIVELY, AND A $1,000 FINE, IS AFFIRMED. GARNER: THE JUDGMENT OF THE CIRCUIT COURT OF LAWRENCE COUNTY OF CONVICTION OF CONSPIRACY AND SENTENCE OF TWENTY YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, WITH FIVE YEARS SUSPENDED AND FIVE YEARS OF POST-RELEASE SUPERVISION, AND A $1,000 FINE, IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO LAWRENCE COUNTY.
LEE, C.J., IRVING AND GRIFFIS, P.JJ., BARNES, ISHEE, ROBERTS, CARLTON, MAXWELL AND JAMES, JJ., CONCUR.

. Although Ford was seen with a gun during the shooting, no one could testify he ever fired it. The State’s theory was that he was standing by or otherwise protecting the others.

. Most of the witnesses called the establishment "Rose Hill” after the road it was located on. Tavia Serrín, April Garner's mother, called the establishment "Unlevel.”

.Some witnesses testified that only Richard Barnes got out of the vehicle.

. One witness testified Cauthen and the Davises shot both Richard and Ricardo as they were lying next to each other on the ground, though this does not comport with the other testimony.

. Both Buckley and Eric Smith testified someone drove over Richard Barnes’s body. Buckley said it was Garner, but Smith testified it was an unidentified woman leaving the club after the shooting. However, every witness who viewed the body afterwards said it showed no evidence of contact with a vehicle, and the State has never advanced the theory that Garner hit anyone with her car.

. The exchange went as follows:
THE COURT: You’re not to talk about this case to anybody. And if anybody tries to talk to you about the case, I expect you to report it to either myself or a law enforcement officer. Do you understand that?
THE WITNESS: Yes, sir.
THE COURT: You have nothing to be fearful of, I hope. Do you understand?
THE WITNESS: (Nods head affirmatively.)

. In his brief, which is not evidence, the attorney states that he observed Judge Harrell “wipe away a tear” while speaking with Lon-gino during the exchange, which is noted in the record to have occurred "at the bench, between the witness and the court.” The attorney also claims this exchange (and others) were loud enough for the jury to have heard, but this is unsubstantiated in the record. The record says:
*1078 (THE FOLLOWING WAS CONDUCTED AT THE BENCH BETWEEN THE WITNESS, STEPHANIE LONGINO, AND THE COURT:)
THE COURT: Now, I realize you’re very nervous. We all are. You don’t haye to be. Be calm. Do the best you can. I know this is a terrible thing. See that sweet little girl that’s writing everything down? Look at her. You don't have to look at anybody else. But you have to answer the questions. There is Kleenexes up here, water, put it in your hand, drink. You take your time. And you be calm. And nobody is going to hurt you. You understand? You’re just up here to tell the truth. That’s all. Okay? Now, can you do it? You look at her. You don’t have to look at anybody else in the room. But you do have to speak into that microphone to where I can hear you and the jury can hear you. Can you do that? You’re here to tell the truth. That’s all. Okay? All right. Take your seat.